

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re: <br><br> Hon. Reinaldo Santiago Concepción | 2013 TSPR 93 <br><br> 189 DPR ____ |

Número del Caso: AD-2012-1

Fecha: 22 de agosto de 2013

Abogados del Querellado:

       Lcdo. Virgilio Mainardi Peralta
       Lcdo. José Rodríguez Rivera
       Lcdo. Heriberto Torres Crespo

Oficina de Administración de los Tribunales
Oficina de Asuntos Legales:

       Lcda. Gina Méndez Miro
       Lcdo. Félix Fumero Pugliesi
       Lcda. Cristina Guerra

Materia: Conducta Profesional – Destitución inmediata del cargo de juez y desaforo de la abogacía

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Hon. Reinaldo Santiago Concepción        AD-2012-001

PER CURIAM

San Juan, Puerto Rico, a 22 de agosto de 2013.

En esta ocasión, debemos evaluar los méritos de una querella presentada contra el Hon. Reinaldo Santiago Concepción, Juez Superior del Centro Judicial de Aibonito, en la que se alega que violó varias disposiciones de los Cánones de Ética Judicial, 4 L.P.R.A. Ap. IV-B, y los Cánones de Ética Profesional, 4 L.P.R.A. Ap. IX. En esencia, se le imputa incurrir en conducta constitutiva de violencia doméstica y uso de sustancias controladas. Luego de examinar el Informe Final de la Comisión de Disciplina Judicial y la prueba documental incluida en su apéndice, coincidimos en que el querellado incurrió en la conducta imputada. Debido a que las

faltas cometidas no solo contravienen los principios de vida democrática y de respeto a la dignidad inviolable del ser humano que permean ambos códigos de ética, sino que vulneran también la política pública de la Rama Judicial en contra de la violencia doméstica y el uso de sustancias controladas, ordenamos la destitución inmediata de Reinaldo Santiago Concepción como Juez Superior del Tribunal General de Justicia de Puerto Rico y su desaforo del ejercicio de la profesión de la abogacía.

## I.

### A. Trasfondo procesal

El Hon. Reinaldo Santiago Concepción fue admitido al ejercicio de la abogacía el 23 de enero de 1998. Según su expediente, ese año trabajó para la Sociedad para la Asistencia Legal (SAL). Posteriormente, fue nombrado como Juez Superior y juramentó a su cargo el 1 de julio de 2009. Inició sus funciones en el Centro Judicial de Ponce. Luego fue trasladado al Centro Judicial de Aibonito.

La Oficina de Administración de los Tribunales (OAT) inició en 2012 una investigación sobre su conducta a raíz de una información que el Lcdo. Federico Rentas Rodríguez, Director de la SAL, refirió a la Directora Administrativa de los Tribunales, Hon. Sonia I. Vélez Colón. En particular, informó que el magistrado incurrió en conducta constitutiva de violencia doméstica y uso de sustancias controladas. Luego de la investigación correspondiente, la OAT presentó ante la Comisión de Disciplina Judicial (Comisión) un Informe de

Investigación con su Apéndice, el cual incluye declaraciones juradas, expedientes médicos, entre otros. El Comisionado Especial designado, el Lcdo. José Miranda de Hostos, determinó causa probable para iniciar un procedimiento disciplinario contra el Juez Santiago Concepción y recomendó como medida provisional suspenderlo de empleo y sueldo. El 15 de junio de 2012, se decretó el relevo temporero, con paga, del magistrado. Acto seguido, la OAT formuló una querella imputándole lo siguiente:

### Primer Cargo

El Juez Santiago incurrió en conducta incompatible con los deberes de su cargo y de su profesión al demostrar un grave menosprecio a la vida, seguridad, integridad y dignidad humana cada vez que destruyó propiedad, amenazó de muerte y empleó fuerza física y violencia verbal hacia su entonces pareja, la Lcda. [BYDM]. Dicha conducta no sólo refleja falta de temperamento judicial, prudencia, decoro, integridad y sensibilidad, sino que está gravemente reñida con los Cánones 1, 4, 5 y 23 de Ética Judicial, así como con el Criterio General de la Parte IV y el Canon 38 del Código de Ética Profesional, unido a los principios consagrados en los preámbulos de ambos códigos de conducta.

### Segundo Cargo

Con el comportamiento observado en su vida privada, el Juez Santiago incurrió en conducta incompatible con los Cánones 1, 4 y 5 de Ética Judicial, al infringir la política pública del Gobierno de Puerto Rico y de la Rama Judicial de evitar todo tipo de discrimen y de cero tolerancia a la violencia doméstica por ser contraria a los principios más básicos de equidad, dignidad y respeto debidos a un ser humano.

### Tercer Cargo

El Juez Santiago incurrió en conducta incompatible con la naturaleza de su función judicial, con las normas que rigen su profesión

y con nuestro ordenamiento jurídico al poseer [y] consumir sustancias controladas, así como al incitar o intentar inducir que [la licenciada BYDM] las utilizara. Dicho comportamiento es contrario a los Cánones 1 y 23 de Ética Judicial, así como al Canon 38 de Ética Profesional.

**Cuarto Cargo**

El Juez Santiago incumplió con los estándares morales que se le exige a todo miembro de la profesión legal, lesionó la imagen de la Rama Judicial y mancilló la estima pública en la Judicatura al exhibir un comportamiento público deshonroso frente a su entonces pareja y frente a la supervisora de ésta[.] En virtud del maltrato dirigido en público y en privado hacia [la licenciada BYDM], el cual incluyó el uso de su título de juez para intimidarla y amenazarla, y en atención a la falta de sinceridad y honradez para con [su supervisora], el Juez Santiago infringió los postulados del Canon 23 de Ética Judicial, del Criterio General de la Parte IV y del Canon 38 del Código de Ética Profesional, así como de los principios consagrados en los preámbulos de ambos códigos de conducta.

El 6 de agosto de 2012, el Juez Santiago Concepción contestó la querella negando en su totalidad lo alegado en su contra.

Dos días después de contestada la querella, el 8 de agosto de 2012, la OAT presentó una *Moción para Informar Incidentes con Testigos*. Expuso que una de las testigos del caso informó que su esposo, Juez Superior del Centro Judicial de Ponce, recibió en su oficina un sobre cerrado que contenía la declaración jurada que ella había ofrecido con "signos de pregunta en determinadas líneas, así como comentarios escritos sobre el testimonio prestado o sobre la situación". Véase Anejo Moción para Informar Incidentes con Testigos, 8 de agosto de 2012. La OAT manifestó su preocupación al

respecto, pues solo había divulgado copia de la declaración jurada al querellado y a su representación legal. La OAT también indicó que vecinos de los padres de la licenciada BYDM alegadamente observaron a dos individuos encapuchados pasar por el área en una guagua en horas de la madrugada.

Según ordenado, los representantes legales del querellado presentaron una moción para expresarse sobre el incidente que la OAT informó. Los letrados negaron "haber participado o tener conocimiento alguno sobre quién pueda haber enviado dicha comunicación" y expusieron que el Juez Santiago Concepción "niega participación alguna en dichos eventos". Contestación a Moción para Informar Incidentes con Testigos, 20 de agosto de 2012, pág. 2. Finalmente, sostuvieron que, cuando la OAT refiere una queja a la Comisión, esta está sujeta al escrutinio público. Posteriormente, la OAT compareció mediante *Moción Informativa y Solicitud de Orden* y expuso que corroboró en la Secretaría del Tribunal Supremo que ninguna persona había solicitado acceso al expediente. Para evidenciarlo, anejó una declaración jurada de la Secretaria Auxiliar del Tribunal. Además, la OAT solicitó a la Comisión que emitiera una orden para proteger información privilegiada del expediente. La Comisión concedió esta petición.

El 27 de agosto de 2012, una semana después de haber presentado la Contestación a Moción para Informar Incidentes con Testigos, los representantes legales del Juez Santiago Concepción solicitaron ser relevados de su representación

legal. Alegaron que surgieron "diferencias y falta de confianza" entre estos y el querellado. La Comisión autorizó el relevo solicitado y otros tres abogados asumieron la representación legal del querellado.

Se celebraron vistas extensas los días 20, 21 de noviembre de 2012 y 10, 11 y 13 de diciembre de 2012, en las que ambas partes tuvieron la oportunidad de presentar amplia prueba documental y testifical.

Tras evaluar la prueba desfilada y adjudicar credibilidad, la Comisión emitió su Informe Final en el cual consignó las determinaciones de hecho y las recomendaciones resumidas a continuación. Adelantamos que la Comisión recomendó unánimemente la destitución del querellado de su cargo de juez y su desaforo del ejercicio de la abogacía.

## B. Determinaciones de hecho

Para la década de 1990, el Juez Santiago Concepción era instructor de aeróbicos y pesas en un gimnasio. En 1992, contrajo segundas nupcias. Su entonces esposa le brindó ayuda económica para que completara su bachillerato y su Juris Doctor. En 2000, se divorciaron. Para ese momento, el querellado se desempeñaba como fiscal. Luego, ambos iniciaron una relación de amistad. Tras el divorcio, la segunda exesposa se mudó a un complejo de vivienda en San Juan donde también residía la madre de ésta. Posteriormente, el querellado se mudó a ese complejo. Según ella, "[v]ivíamos los tres, mi mamá, él y yo, cada uno en su apartamento". Informe Final de la Comisión (Informe), pág. 6.

Luego del divorcio, el querellado tuvo otras tres relaciones sentimentales, previas a la que tuvo con la licenciada BYDM.

El 1 de julio de 2009, el querellado juramentó como Juez Superior y comenzó a desempeñar sus funciones en el Centro Judicial de Ponce. Para mayo de 2011, residía los días de semana en Ponce en un apartamento alquilado. Durante los fines de semana, regresaba a su apartamento en San Juan. Por su parte, la licenciada BYDM trabajaba como abogada de la SAL en las oficinas de Ponce, Mayagüez y Bayamón. Ella es madre de tres hijos y residía en Mayagüez en la residencia de su madre.

El Juez Santiago Concepción y la licenciada BYDM se conocieron y comenzaron una relación sentimental. En mayo de 2011, la licenciada BYDM acompañó al querellado al apartamento de San Juan. Ese día, la licenciada BYDM conoció a la segunda exesposa del querellado. Él presentó a esta última como su hermana.

El día del cumpleaños de la licenciada BYDM, el Juez Santiago Concepción le regaló flores y le pidió que se quedara con él. Desde ese día, comenzaron a convivir en el apartamento que este alquiló en Ponce. Sin embargo, el ánimo del querellado cambió el 2 de junio de 2011, cuando olvidó las llaves del apartamento. La licenciada BYDM le expresó que el hecho de perder las llaves no era motivo para molestarse y hacer un "show", a lo que el querellado le contestó molesto que le daba vergüenza. Informe, pág. 7. Ella lo acompañó a

buscar una copia de las llaves en la residencia del arrendador del apartamento. Al regresar al apartamento, la licenciada BYDM sirvió tragos y observó que "él tenía una cara de coraje tan terrible…" Íd. Se mantuvo callada, pero el querellado le gritó agresivamente "tú eres una *loser*" y le reclamó por su vestimenta. Íd. Le dijo que ella no tenía pudor en la cara, le mencionó que no podía entender la situación porque ella venía de un barrio mientras que él era un juez y tenía que cuidar su reputación ya que ella tan solo era una abogada de la SAL.

El 10 de junio de 2011, el Juez Santiago Concepción comenzó sus vacaciones y la licenciada BYDM se ausentó del trabajo por un asunto personal. Fueron al apartamento en San Juan y consumieron bebidas alcohólicas desde temprano. En la noche, el querellado salió a comprar más hielo. Fue solo porque tenía reparos con la vestimenta de la licenciada BYDM: un "*jumpsuit* corto estilo *halter*". Informe, pág. 8. El querellado olvidó las llaves del apartamento. Cuando regresó, la licenciada BYDM se había quedado dormida en el sofá y no lo escuchó tocando la puerta. Una vez el Juez Santiago Concepción logró entrar, le dio puños en la cara, en el brazo izquierdo y en el muslo, mientras ella permanecía acostada en el sofá. "Me decía puta, no me abriste tuve que llamar a [mi exesposa]", testificó la perjudicada. Íd. Con un palo de escoba, rompió objetos en el apartamento, mientras perseguía a la licenciada BYDM. Le arrancó la ropa y la obligó a subir desnuda por unas escaleras hasta la terraza, donde le quemó

el "*jumper*" mientras le gritaba que eso le pasaba a las "putas" como ella. Íd. El querellado agredió a la licenciada BYDM "hasta que me noqueó". Íd. Según la Comisión, ella testificó afectada y temblorosa que cuando despertó en horas de la madrugada: "[a]y Dios mío, cuando yo me miré en el espejo yo estaba destruida… parecía un elefante". Íd. Detalló que estaba desfigurada, tenía el oído rojo y el muslo negro, y sentía un dolor fuerte en el brazo izquierdo. Eventualmente, el Juez Santiago Concepción llamó a su exesposa para preguntarle si tenía un antiinflamatorio. La licenciada BYDM dijo al querellado que tenían que ir al hospital, pero no fueron pues no sabían qué iban a decir.

La licenciada BYDM no mejoró en el fin de semana. El ojo no se le veía por la inflamación y le dolía mucho el oído. Ella tenía que llevar al trabajo unos expedientes y comentó al Juez Santiago Concepción "le voy a tener que decir a mi jefa que fue el papá de mis nenes, mi exesposo". Informe, pág. 9. Él aceptó ofrecer esa versión de los hechos. Finalmente, ella llamó a un amigo para que le refiriera un doctor discreto que no hiciera muchas preguntas. Su amigo la refirió a un doctor en Caguas.

El lunes, 13 de junio de 2011, el Juez Santiago Concepción acompañó a la licenciada BYDM a la residencia del doctor. Ella se vistió con una camisa de manga larga y un pantalón largo para que no se le viera el cuerpo completo. Tenía el brazo "violeta". Informe, pág. 9. Según acordaron, ambos dijeron al médico que ella se había caído en la bañera.

La licenciada BYDM testificó que percibió que el doctor no les creyó, por la expresión facial que hizo al escucharlos. El doctor examinó su rostro y encontró que su oído estaba sangrando, por lo que le indicó que tenía que ir al hospital. El galeno le informó la hora en que podría atenderla en la sala de emergencia del Hospital HIMA.

Ya en el Hospital, el doctor suministró medicamentos antiinflamatorios. Según el expediente médico, la licenciada BYDM sostuvo que sufrió una caída y describió que le dolían el ojo y la boca. Exhibit 6, Parte Querellante. En una escala del 1 al 10, señaló que la intensidad del dolor era 5 (moderada) y describió el dolor como penetrante y constante. Íd. El galeno le expidió un Certificado Médico, en el cual diagnosticó "left head and facial trauma" y le recomendó catorce días de descanso, hasta el 27 de junio de 2011. Exhibit 1, Parte Querellante. Según la licenciada BYDM, el querellado puso "el grito en el cielo" cuando vio el certificado médico y se molestó por lo que iban a decir. Informe, págs. 9-10.

Ese mismo día, la licenciada BYDM llamó a su supervisora y se acogió a licencia de enfermedad. Indicó que había tenido un incidente con su exesposo. Su supervisora aprobó su solicitud y le solicitó los expedientes de sus casos pendientes.

En el ínterin, el Juez Santiago Concepción le propuso matrimonio a la licenciada BYDM. Le aseguró que lo sucedido constituía un episodio aislado y que todo estaría bien. Ella

declaró que le creyó porque lo quería y pensaba que el incidente violento no se podía repetir porque él era un juez.

Aproximadamente una semana después de la primera agresión, la licenciada BYDM acordó con su supervisora la entrega de los expedientes solicitados. La noche en que los iba a entregar, el Juez Santiago Concepción había ingerido bebidas alcohólicas. Mientras él cenaba, ella habló por teléfono con su hija. Cuando él se percató de la conversación telefónica, "se puso como un demonio", comenzó a gritarle "puta", la obligó a que dejara de hablar con esos "pendejos" y le exigió atención total porque, según él, ella tenía que acompañarlo en la mesa. Informe, pág. 10. Tiró el plato de comida, las sillas y rompió varios objetos.

Finalmente, el Juez Santiago Concepción llevó a la licenciada BYDM a la residencia de su supervisora, aunque más tarde de lo acordado. Esta última testificó: "yo me espanté al verla, parece que le habían dado tanto puño". Informe, pág. 10. La licenciada BYDM, frente al Juez Santiago Concepción, dijo a su supervisora que el padre de sus hijos la había agredido. Esta respondió que tenía que denunciarlo y se ofreció a tomarle una foto, pero la licenciada BYDM se negó. Su supervisora añadió que, cuando la licenciada BYDM le entregó el expediente, le indicó que le dolía el tímpano derecho. Los hematomas de los brazos ya se estaban tornando color verdoso.

La licenciada BYDM se ausentó por enfermedad hasta el 27 de junio de 2011. A partir de ese día, comenzó a ausentarse

por "asunto personal". Luego, comenzó su licencia de vacaciones regulares desde el 5 de julio hasta el 11 de julio de 2011. Estas habían sido autorizadas previamente. Exhibit 5, Parte Querellante. El 12 de julio de 2011, la licenciada BYDM se reintegró a trabajar e informó a su supervisora que se iba a casar.

Posteriormente, el querellado se encontró con la supervisora de la licenciada BYDM en el Tribunal de Ponce y le solicitó hablar. Fueron a su oficina y él le manifestó que estaba "molesto", que estaba "tragando gordo", porque la licenciada BYDM no le había dicho quién la agredió. Informe, pág. 11. La supervisora testificó que lo escuchó extrañada porque la licenciada BYDM había dicho en su residencia delante de él que fue su exesposo quien la había golpeado y porque le extrañó que el Juez Santiago Concepción decidiera casarse con una mujer que había sido agredida sin saber quién la agredió.

Surge del Informe que, antes de la boda, el Juez Santiago Concepción decía a la licenciada BYDM que todavía se podía arrepentir de casarse con ella y la insultaba diciéndole "anormal", "estúpida", "tusa" e "hija de negra". Informe, pág. 11. Además, le "jaloneaba los brazos" y le botó casi toda la ropa, pues él controlaba su apariencia física. Íd. Tampoco quería que ella fuera a ver a su familia a Mayagüez.

Por otra parte, la licenciada BYDM testificó que observó que él tenía una cartera marrón de cuero pequeña y que le

indicó que no la tocara. Eventualmente, ella abrió la cartera y encontró "bolsas transparentes con polvo blanco" que pudo reconocer como cocaína. Informe, pág. 11. Al confrontarlo, el Juez Santiago Concepción le dijo que no se hiciera la "pendeja", que de donde ella venía "sabía Dios cuánto [se] había metido" y que "él llevaba veinte años metiéndose perico" y no lo habían tocado. Íd., pág. 12.

Cerca del día de su boda, el querellado compró a la licenciada BYDM el traje de boda y el anillo con una tarjeta de crédito que mantenía en común con su exesposa. Según esta última, él le rembolsó el dinero.

El 30 de julio de 2011, la licenciada BYDM y el Juez Santiago Concepción contrajeron matrimonio en la residencia del dueño del apartamento de Ponce. Tanto el querellado como la OAT presentaron fotos de la boda como evidencia. En estas pueden observarse marcas en el brazo izquierdo de la licenciada BYDM.

En vista del matrimonio entre ambos y para evitar conflictos en el Tribunal de Ponce, la licenciada BYDM fue trasladada a la oficina de Mayagüez de la SAL. El querellado le prohibió salir con el "grupete de abogados", ya que, según él, los abogados de la SAL valían nada y ella era la esposa de un juez. Informe, pág. 12.

El sábado, 20 de agosto de 2011, era el cumpleaños del Juez Santiago Concepción. Desde temprano, el querellado empezó a beber y a usar cocaína. La pareja acudió a una tienda de teléfonos celulares en Plaza las Américas debido a

que el querellado no podía desbloquear su teléfono móvil. No obstante, él olvidó su cartera y no pudo completar la gestión porque no tenía una identificación con foto. El Juez Santiago Concepción se puso de mal humor y fue al carro a buscar su cartera. Sin embargo, al regresar, se percató de que su licencia no estaba en la cartera. Molesto, el querellado tiró su teléfono contra el suelo en la tienda. Llegó un guardia de seguridad, él recogió el teléfono y exclamó "váyanse todos pa'l carajo". Informe, pág. 14. Acto seguido, cogió a la licenciada BYDM por el cuello y la empujó contra una vitrina. Luego continuó golpeándola e insultándola de camino al estacionamiento y dentro del automóvil. Allí la agredió en la cara, en la cabeza y en el brazo. Le exigió que no lo dejara gritando solo y que le peleara. Posteriormente, se dirigieron a una tienda de electrónicos en Plaza Carolina, donde el querellado compró un teléfono "para su hijo que vivía en Estados Unidos". Íd. El Juez Santiago Concepción no tiene hijos.

Ese día, el querellado compró comida a la licenciada BYDM. No obstante, ella no se la comió completa, pues él controlaba la comida que ella ingería, le prohibía ordenar en los restaurantes, la obligaba a hacer ejercicios y le decía "vaca" y "gorda". Informe, pág. 14. Ella perdió más de doce libras de peso durante la relación.

Además, ese sábado el querellado reveló a la licenciada BYDM quién era realmente su supuesta hermana, diciéndole "mira cómo te he cogido de pendeja" porque ella "no es mi

hermana es mi exesposa". Informe, pág. 15. Asimismo le dijo "tú le tienes que agradecer" porque "ella fue la que me puso a estudiar cuando tenía veintiún años". Íd. Durante el resto del día, el Juez Santiago Concepción continuó insultándola.

En el mes de septiembre, el querellado reclamaba constantemente a la licenciada BYDM por sus tardanzas en regresar de Mayagüez a Ponce luego de trabajar. Cuando llegaba tarde, él le halaba el pelo y destruía objetos en el apartamento. En una ocasión, el querellado le cuestionó que "con qué macho andaba" y le dio un golpe en el ojo derecho. Informe, pág. 13. La licenciada BYDM tuvo que maquillarse el ojo para disimular la lesión. En vista de estas peleas, ella solicitó exitosamente un traslado a Bayamón, efectivo el 6 de septiembre de 2011. Sin embargo, las discusiones continuaron.

Un viernes, el matrimonio se dirigía de Ponce a San Juan. Él guiaba descontrolado como a "100 mph" y ella le pidió que redujera la velocidad. Informe, pág. 13. Sin embargo, él le dijo que se callara. El querellado tomó una ruta en San Juan que ella desconocía y se detuvo en lo que resultó ser un punto de drogas. Íd. Una persona se les acercó, el querellado se bajó del vehículo, compró algo y lo echó en la cartera marrón. La licenciada BYDM estaba asustada pues no había estado en un punto de drogas de noche.[1] Él la insultó diciéndole "tú siempre cagá", la agarró por el pelo y le dio "tanto y tanto" mientras le decía "aquí te vas a quedar pendeja pa' que aprendas". Id. La montó de nuevo en el

---

[1] Como parte de su trabajo en la SAL, la licenciada BYDM había visitado puntos de drogas en horas del día.

carro halándola por el pelo, le dio una bofetada, le cuestionó "tú con tus cagaeras" y le recordó que él llevaba "tanto tiempo haciendo esto".[2] Íd. Cuando llegaron al apartamento en San Juan, ella se bañó y se acostó. Él no regresó a la habitación. Esa no fue la única vez que la obligó a ir a un punto de drogas.

La licenciada BYDM testificó que intentaba estar "sobria y alerta" porque él usaba en su contra todo lo que ella decía. Informe, pág. 13. Cuando hablaba de sus hijos, él comentaba que sabría Dios con quién los tuvo porque ella tenía cara de "puta". Íd., págs. 13-14. También, cuando este "olía droga en el baño", invitaba a la licenciada BYDM. Íd., pág. 14. Al ella negarse, él se molestaba y la insultaba.

Por otra parte, el Juez Santiago Concepción acostumbraba llevar a la licenciada BYDM a comprar ropa porque ella tenía que "adecentarse". Informe, pág. 15. Ella testificó que era una tortura y que él se metía en el probador con ella. Al respecto, la Gerente de una tienda en Plaza Las Américas testificó que el Juez Santiago Concepción y la licenciada BYDM eran clientes de la tienda y que llegó a atenderlos personalmente. Recordó que, en una ocasión, la apariencia de la licenciada BYDM era "sumisa, con miedo" y notó que

---

[2] Según el Informe de Investigación que la OAT presentó ante la Comisión y que dio pie a la presentación de la querella contra el Juez Santiago Concepción, el sábado siguiente a este incidente, el querellado volvió al punto de drogas y un joven le dijo: "Mire *mister*, *pa'* que se lo diga otro se lo digo yo. Que vimos ahí que pasó algo la semana pasada con una muchacha, que usted no puede venir más aquí". Informe de Investigación, pág. 13. A raíz de ese incidente, el Juez Santiago Concepción cambió su carro. Íd.

utilizaba demasiado maquillaje. Íd. Cuando la atendió en el probador, observó una cortadura debajo de un ojo y hematomas en el brazo. Además, declaró que el Juez Santiago Concepción olía a alcohol, parecía que "estaba tomado" y se mostraba dominante. Íd. Asimismo detalló que este se dirigía a las empleadas de modo demandante y a la licenciada BYDM de forma agresiva. En fin, la Gerente llamó a los empleados de seguridad del centro comercial, pero ellos le indicaron que no podían intervenir en ese punto. El suceso ameritó que preparara un reporte interno.

La licenciada BYDM declaró que, en otra ocasión, el querellado la empujó contra una vitrina de relojes en Plaza las Américas. De igual forma, relató que una vez la agredió con las bolsas de compras, mientras los presentes la grababan y retrataban con teléfonos celulares. Testificó que le preguntaban si estaba bien y decían al querellado que lo tenían grabado.

La licenciada BYDM también declaró que tenía que hacer todo como él quería. Si dejaba gotas de agua en el fregadero, el Juez Santiago Concepción restrellaba su cabeza contra este. También le peleaba si le llevaba una taza de café húmeda. Testificó que intentaba "hacer las cosas bien" pero nada era suficiente, que cada día era peor y se acostaba pensando qué pasaría el próximo día. Informe, pág. 16. Además, él la obligaba a preparar comida para su exesposa.

El 7 de septiembre de 2011, el Juez Santiago Concepción usó cocaína en el apartamento conyugal e incitó a la

licenciada BYDM a que hiciera lo mismo. Ella se negó y discutieron. Mientras el querellado la agredía, ella le pedía que no le pegara más. Según testificó la licenciada BYDM, "sabía que me iba a matar". Informe, pág. 16. Un vecino llamó anónimamente al servicio de emergencias 911 y llegaron al lugar entre seis a ocho patrullas de la Policía. Exhibit 3, OAT, Informe de Incidente. El querellado ordenó a la licenciada BYDM "acaba y vístete". Informe, pág. 16. Ella se vistió de forma que las marcas de los golpes quedaran ocultas. El querellado abrió la puerta y un agente le informó que tenía que hablar con la dama. La licenciada BYDM los atendió y les dijo que todo estaba bien. Ellos la invitaron a hablar con un fiscal, pero ella se negó. Finalmente, en el informe de querella se consignó que: "[r]elacionado a esta querella de supuesto [sic] Ley 54. Alega la dama, quien no quiso identificarse, solo que era Abogada de Asistencia Legal en el área [sic] de Bayamón; que todo se encontraba en orden". Exhibit 3, OAT, Informe de Incidente. Cuando la Policía se marchó, el querellado se asomó al balcón riéndose.

El lunes, 26 de septiembre de 2011, era el cumpleaños de la madre del querellado, quien llegó al apartamento de su hijo con un amigo. Comieron entremeses y tomaron bebidas alcohólicas. Cuando se retiraron, la licenciada BYDM contestó una llamada telefónica de su hija. El querellado se molestó, le cuestionó quién la llamó y afirmó "por eso las prefiero feas y viejas en vez de una joven que me las pegue". Informe, pág. 17. Furioso, restrelló el teléfono, "lo hizo cantos" y

propinó a la licenciada BYDM una bofetada tan fuerte que su cara "se viró completa", calló sobre un toallero y se le abrió el pómulo derecho. Íd. Él reaccionó cuestionándole "mira lo que me haces hacer". Íd. A pesar de la herida, el querellado no la llevó a recibir asistencia médica; sino que la llevó a la residencia de su madre a quien le dijo que ahí le llevaba esta "mierda". Íd. Su madre le respondió "pero qué pasa, tú no puedes seguir así" y manifestó a la licenciada BYDM que su hijo estaba mal a lo que ella contestó "sí, cada vez peor". Íd. La madre del querellado les dijo que no podían ir al hospital.

Al día siguiente, la madre del querellado llevó a la licenciada BYDM a la oficina de un dermatólogo. La primera fue quien habló y dijo que la licenciada BYDM siempre estaba borracha y que se resbaló en la bañera. El doctor dijo que no se podía coser la herida por el tiempo transcurrido, por lo que solo le puso un "punto de mariposa". Exhibit 4, Parte Querellante. En el certificado médico, el doctor le recomendó descanso del 27 al 30 de septiembre de 2011.

El Juez Santiago Concepción obligaba a la licenciada BYDM a maquillarse la herida. Consiguientemente, esta no curaba y continuaba supurando. Ella permaneció en casa de su suegra hasta el miércoles, 28 de septiembre de 2011. Quería irse, pero el Juez Santiago Concepción le advertía que su familia la vería así. Él le reconoció que estaba abusando de ella y se justificó diciendo que estaba repitiendo patrones de abuso aprendidos por las agresiones de su padre hacia su

madre.[3] La licenciada BYDM entonces le rogó que buscaran ayuda profesional.

No obstante, el Juez Santiago Concepción continuó insultando a la licenciada BYDM. Incluso, la amenazó indicándole que tuviera cuidado con lo que diría al regresar a su trabajo porque la podían encontrar por Cupey con "un alambre de púa". Informe, pág. 18. Según ella testificó, él se jactaba de que sabía cómo hacer esas cosas porque fue fiscal.

A finales de septiembre, la licenciada BYDM se encontró con su supervisora. Esta le vio el ojo derecho morado y le preguntó si el querellado la estaba agrediendo. La licenciada BYDM lo negó. Asimismo, en otra ocasión, la supervisora le vio una raya debajo del pómulo del ojo derecho.

El día de Acción de Gracias, la licenciada BYDM pidió permiso al Juez Santiago Concepción para que sus hijos celebraran con ellos. Él se negó porque sus "mierdas de hijos" iban a "hacer un *Woodstock*" en su casa. Informe, pág. 18. Al final, le dijo: "pues vete pal carajo a *Thanksgiving* a Mayagüez y más te vale que llegues temprano". Íd., pág. 19.

Posteriormente, el matrimonio asistió a una fiesta de quinceañero de una familiar del querellado. Él sacó a la licenciada BYDM del lugar a golpes porque ella no bailó como

---

[3] La madre del Juez Santiago Concepción testificó que estuvo veinticuatro años en una relación con el padre del querellado en la cual fue víctima de violencia doméstica. Declaró que, durante la crianza del querellado, el padre de este la agredió en muchas ocasiones y el querellado "cogió mucho golpe" defendiéndola. Informe Final de la Comisión (Informe), pág. 5.

él quería y le recordó que él fue coreógrafo y que ganó un concurso de belleza masculina de Puerto Rico.

El 28 de diciembre de 2011, hubo una fiesta en casa del dueño del apartamento de Ponce. La licenciada BYDM habló con todos los presentes. El Juez Santiago Concepción se disgustó. Le apretaba el brazo porque no quería que ella hablara pues la consideraba una "basura". Informe, pág. 19. Al regresar al apartamento en Ponce, el querellado propinó varios golpes a la licenciada BYDM en el costado derecho del cuerpo y le cuestionó que "cómo carajo te atreves tú a hablar aquí" ya que era simplemente una abogada de la SAL, una "sucia". Íd. En su testimonio, aclaró que el querellado ya no le daba en la cara, porque había rumores de que ella usaba maquillaje en exceso para ocultar los golpes de su rostro. Ella testificó, además, que el querellado le recriminaba porque ella tenía tatuajes y justificaba los suyos diciendo "yo soy el macho". Íd.

El 29 de diciembre de 2011, la hermana del dueño del apartamento de Ponce los invitó a desayunar. La licenciada BYDM llegó cojeando debido al dolor en el costado y le contó todo porque pensó "que esa era la última vez que la iba a ver". Informe, pág. 19.

El Juez Santiago Concepción y la licenciada BYDM regresaron al apartamento de San Juan. Él la culpó de que no los invitaran a despedir el año en Ponce.

El sábado, 31 de diciembre de 2011, estaban en el apartamento de San Juan. Desde temprano, el Juez Santiago

Concepción ingirió bebidas alcohólicas y utilizó sustancias controladas. Mientras veían la película titulada "*Book of Eli*", comenzaron a discutir sobre la Biblia y la licenciada BYDM le dijo que creía en Dios, pero opinaba que el contenido de la Biblia era como un cuento que se generaba de un grupo a otro. Él se jactó de que había hecho estudios bíblicos durante años y le dijo: "bruta… no has aprendido nada". Informe, pág. 20. Acto seguido, le haló el cabello y le dio en el lado derecho de la cabeza, el rostro y el costado derecho. La licenciada BYDM pidió que no le diera más porque le dolía mucho, pero él "no tenía ninguna compasión y me seguía dando y dando". Íd. Tras la golpiza, la licenciada BYDM no podía dormir, gritaba del dolor y le pedía que la llevara al hospital.

Sin embargo, el Juez Santiago Concepción no la llevó a recibir asistencia médica hasta el lunes, 2 de enero de 2012, cuando la llevó al Hospital Pavía. Exhibit 5, OAT, Pavía Hospital Emergency Room Record. El querellado grabó todo lo que ella habló con el enfermero. Al ella preguntarle por qué grababa, él respondió "no tienes que cuestionarme". Informe, pág. 20. Luego, la licenciada BYDM dijo al doctor que se cayó en la bañera el miércoles anterior. Por su parte, el Juez Santiago Concepción dijo que fue al hospital el lunes porque no podía con el dolor. "Usted sabe cómo son las mujeres, no quieren venir a los médicos", aseveró. Íd. Mediante placas, el doctor diagnosticó una fractura en la quinta costilla del lado derecho. Le recetó medicamentos y le ordenó reposo

absoluto. Sin embargo, cuando salieron del hospital, el Juez Santiago Concepción la obligó a acompañarlo a comprar una computadora para él. Fueron a cinco establecimientos distintos en busca de la computadora, por lo que regresaron al apartamento al anochecer. El querellado le dijo que era la culpable de todo y que tuviera cuidado con lo que iba a decir porque él era juez y no le creerían a ella.

En esa semana, la exesposa del querellado visitó el apartamento a petición de este para "limar asperezas". Informe, págs. 20-21. Cuando se retiró, este tiró las pertenencias de la licenciada BYDM por el balcón, rompió objetos, la agarró por el cuello, la golpeó en la pierna y le lastimó un dedo del pie. El querellado decidió irse del apartamento antes de que alguien llamara a la Policía. El próximo día, la licenciada BYDM regresó a Mayagüez.

Entre el 22 y 23 de enero de 2012, la licenciada BYDM y el Juez Santiago Concepción tuvieron una conversación telefónica extensa. Decidieron reanudar la relación y ella se mudó nuevamente con él, creyendo que cambiaría. No obstante, continuaron las amenazas. Él le decía: "¿Y si te mato? ¿Y si te mato? Yo lo voy a perder todo pero primero te vas tú". Informe, pág. 21.

Para ese entonces, el Juez Santiago Concepción había botado la cartera de cuero en la que guardaba las drogas. Sin embargo, la licenciada BYDM encontró piedras blancas en unas bolsas verdes y observó al querellado molerlas e inhalar la sustancia resultante. Ella declaró que a veces él botaba las

drogas, decía "yo no puedo seguir así" y luego "le entraba un cargo de conciencia, él empezaba a llorar, a llorar y a mí me daba tanta pena". Informe, pág. 21.

El 12 de febrero de 2012, el Juez Santiago Concepción actuó cariñoso con la licenciada BYDM. No obstante, el querellado habló con su exesposa y, luego, tuvo una discusión con la licenciada BYDM. Él le dijo: "no pienses que yo creo que eres buena mujer, si tú fueras buena mujer te hubieras ofrecido a cuidar a la mamá de [mi exesposa]". Informe, pág. 22. El lunes, 13 de febrero, ella se fue, pero tuvo que regresar pues no tenía llaves. Al regresar, vio piedras de cocaína en la cama.

El 15 de febrero de 2012, la licenciada BYDM tuvo una vista en el Centro Judicial de Ponce. Luego, fue a la cocina de la oficina de la SAL junto a su supervisora. La licenciada BYDM le contó todo el maltrato que sufrió y que fue el Juez Santiago Concepción quien la había agredido; no su expareja. La supervisora se alarmó, le dijo que tenía que denunciarlo y habló con el licenciado Rentas Rodríguez. Este se reunió con la licenciada BYDM al día siguiente. Inmediatamente la trasladó a Mayagüez y le autorizó un periodo de vacaciones. Además, le preguntó si tenía dinero a lo que ella respondió que no porque el querellado le quitaba todo el cheque. Consecuentemente, el licenciado Rentas Rodríguez le adelantó el pago del sueldo. Luego, se comunicó con la OAT.

El 18 de febrero de 2012, la licenciada BYDM abandonó el apartamento conyugal. Posteriormente, se celebró la vista que culminó en la sentencia de divorcio por consentimiento mutuo.

Habiendo determinado todo lo anterior, la Comisión emitió su Informe. En este, consignó su preocupación sobre la seguridad de la licenciada BYDM y concluyó

> que el querellado infringió todos los cargos imputados por la OAT, ejerciendo violencia física y psicológica contra su ex pareja, discriminando contra ella por razón de género, faltando a la verdad y a la honradez y utilizando e incitando el uso de sustancias controladas, desplegando un comportamiento público y privado bochornoso e inmoral en atropello de los principios fundamentales de dignidad y respeto a la igualdad de todos los seres humanos. Ante este nefasto panorama, y a la infracción de los Cánones de Ética Judicial y el Código de Ética Profesional, unánimemente recomendamos que este Honorable Tribunal destituya al querellado de su cargo de juez y, a su vez, dentro de su poder inherente de regular la profesión, decrete su desaforo del ejercicio de la abogacía.

El 17 de mayo de 2012, Juez Santiago Concepción presentó una Solicitud de Reconsideración ante la Comisión. Según le fue ordenado, el 23 de mayo de 2013, la OAT presentó una Réplica a su Solicitud de Reconsideración. Estudiadas ambas posiciones, el 21 de junio de 2013, la Comisión denegó reconsiderar. Finalmente, el Juez Santiago Concepción presentó una Reacción a Informe Final de la Comisión, en el cual planteó, en esencia, que la Comisión adjudicó credibilidad y evaluó la prueba erróneamente.

Luego de evaluar detenidamente el Informe rendido por la Comisión, el expediente del procedimiento disciplinario y las

comparecencias del Juez Santiago Concepción y la OAT, estamos en posición de resolver.

## II.

La Constitución del Estado Libre Asociado de Puerto Rico confiere autoridad a este Tribunal para llevar a cabo los procedimientos disciplinarios relacionados con los jueces de los tribunales de inferior jerarquía. Art. V, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1. Como parte de esa autoridad, aprobamos los Cánones de Ética Judicial, 4 L.P.R.A. Ap. IV-B, en cuyo Preámbulo dispusimos lo siguiente:

> Los miembros del Poder Judicial promueven y velan por la igualdad de toda persona ante los Tribunales y evidencian, mediante su comportamiento, la importancia de una judicatura independiente e imparcial para la protección de los derechos humanos. Al promover una judicatura independiente, las juezas y los jueces garantizan que los tribunales sean defensores del constitucionalismo y del principio de legalidad.

> Al igual que todo ciudadano o ciudadana, las juezas y los jueces están obligados a cumplir con la ley, modelando la conducta ciudadana a la que aspira la sociedad democrática. Están obligados a cumplir con las obligaciones de la Rama Judicial y respetar y honrar la función judicial. Además, al asumir el cargo aceptan también ciertas restricciones a su conducta, tanto en el ejercicio de sus funciones propiamente judiciales, como en sus demás actividades, ya sean personales o profesionales. Estas limitaciones, si bien no les privan de los derechos que poseen como miembros de nuestra sociedad, representan sacrificios en su vida pública y privada que enaltecen la integridad e independencia de su ministerio y estimulan el respeto y la confianza en la judicatura. Igualmente, se comprometen a fomentar un trato respetuoso y cordial hacia sus pares, las funcionarias y los funcionarios de la Rama Judicial y los que comparecen en sala […]

De acuerdo al historial del Preámbulo citado, este constituye una declaración general de los principios que rigen la interpretación de los Cánones de Ética Judicial.

Al Juez Santiago Concepción se le imputa violar los Cánones 1, 4, 5 y 23 de Ética Judicial, *supra*, así como el Criterio General de la Parte IV y el Canon 38 del Código de Ética Profesional, *supra*, unido a los principios consagrados en los preámbulos de ambos códigos de conducta. Veamos qué establecen estas disposiciones.

El Canon 1 de Ética Judicial, 4 L.P.R.A. Ap. IV-B C.1, dispone que "[l]as juezas y los jueces respetarán y cumplirán la ley y serán fieles al juramento de su cargo". Según los comentarios de este canon, el objetivo que persigue es "transmitir claramente la idea de que las juezas y los jueces no están por encima de la ley y son los primeros llamados a respetarla y cumplirla". Íd. Véase, además, In re Grau Acosta, 172 D.P.R. 159 (2007).

En lo pertinente al procedimiento disciplinario de epígrafe, existen dos leyes que proscriben la conducta imputada al Juez Santiago Concepción. En primer lugar, la Ley de Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54-1989, según enmendada, 8 L.P.R.A. sec. 601 *et seq.*, (Ley Núm. 54) prohíbe la violencia física y psicológica contra la pareja. En segundo lugar, la Ley de Sustancias Controladas de Puerto Rico, Ley Núm. 4-1971, según enmendada, 24 L.P.R.A. sec. 240 *et seq.*, (Ley Núm. 4) prohíbe la posesión, fabricación, distribución y dispensación de

sustancias controladas. Véase In re Ruiz Rivera, 168 D.P.R. 246 (2006) (Destitución de un juez por haber consumido cocaína, entre otras cosas).

El Canon 4 de Ética Judicial, 4 L.P.R.A. Ap. IV-B C.4, establece que "[l]as juezas y los jueces cumplirán cuidadosa y diligentemente las obligaciones administrativas que les imponen las leyes y los reglamentos aplicables a la Rama Judicial. También cumplirán diligentemente las normas y órdenes administrativas pertinentes de la Oficina de Administración de los Tribunales". Con relación a este Canon, es necesario señalar que la Rama Judicial ha tomado medidas diversas para prevenir y atender esta problemática, entre las cuales figuran las siguientes:

> proveer adiestramientos especializados a jueces y juezas, preparar un Libro de Estrado sobre órdenes de protección en casos de violencia doméstica, publicar un Protocolo de manejo de caso de violencia doméstica, crear salas especializadas en casos de violencia doméstica en diversas regiones judiciales, brindar servicios de intercesoras y representación legal a víctimas de violencia doméstica, revisar los formularios relacionados con la Ley 54 y establecer un sistema de órdenes de protección automatizadas. Dávila Nieves v. Meléndez, 2013 T.S.P.R. 12, 45-46, 187 D.P.R. ___ (2013).

Por su parte, el Canon 5 de Ética Judicial, 4 L.P.R.A. Ap. IV-B C.5, establece que: "[l]as juezas y los jueces no incurrirán en conducta constitutiva de discrimen por motivo de raza, color, nacimiento, origen, condición socioeconómica, ideas políticas o religiosas, condición física o mental, edad, género u orientación sexual". Esta exigencia ética parte del mandato constitucional establecido en nuestra Carta de Derechos que consagra la inviolabilidad de la dignidad de

los seres humanos, establece su igualdad ante la ley y prohíbe el discrimen por raza, color, sexo, entre otras causas. Const. E.L.A., *supra*, Art. II, Sec. 1. De la misma forma, es pertinente destacar que nuestra Constitución establece que "toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Const. E.L.A., *supra*, Sec. 8.

Respecto a las actividades extrajudiciales, el Canon 23, 4 L.P.R.A. Ap. IV-B C. 23, dispone que "[l]as juezas y los jueces se comportarán públicamente de manera que sus actuaciones no provoquen dudas sobre su capacidad para adjudicar imparcialmente las controversias judiciales, no deshonren el cargo judicial y no interfieran con el cabal desempeño de sus funciones judiciales". Esta norma de conducta general corresponde a la alta estima y confianza pública que gozan los jueces y las juezas. In re Claverol Siaca, 175 D.P.R. 177, 190 (2009). Véase, además, In re Nevárez Zavala, 123 D.P.R. 511 (1989). Por ello, su función les requiere que "se comporten conforme lo exige su cargo, tanto dentro como fuera del tribunal y que su comportamiento se dirija a enaltecer el cargo que ocupan y fomentar el respeto hacia éste". In re Claverol Siaca, *supra*; In re Cruz Aponte, 159 D.P.R. 170, 186-187 (2003). Así pues, su comportamiento en todos los aspectos de su vida profesional y personal debe ser intachable y ejemplar. In re Robles Sanabria, *supra*, pág. 510.

Por otra parte, el Criterio General de la Parte I del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, define los deberes de los abogados para con la sociedad. En lo pertinente, establece que:

> [l]os miembros de la profesión legal, individual y colectivamente, tienen la responsabilidad de velar por que los distintos procesos legales de la sociedad incorporen y consagren de manera efectiva y adecuada los principios de vida democrática y de respeto a la inviolable dignidad del ser humano. […] También es menester que todo abogado, como ciudadano y en su capacidad profesional, ya sea como juez, fiscal, abogado postulante, asesor o en cualquier otro carácter, actúe siempre de acuerdo al ideal expresado en el preámbulo de estos cánones.

Más adelante, el Criterio General de la Parte IV del Código de Ética Profesional, *supra*, sobre los deberes del abogado en relación con sus compañeros y su profesión, dispone que:

> [l]a preservación del honor y la dignidad de la profesión y la buena relación entre compañeros es responsabilidad ineludible de todo miembro de la profesión legal y para ello todo abogado debe observar con sus compañeros una actitud respetuosa, sincera, honrada y de cordialidad y cooperación profesional, velando siempre por el buen ejercicio de la profesión legal.

Esta cuarta parte del referido Código establece en su Canon 35, 4 L.P.R.A. Ap. IX C.35, que "[l]a conducta de cualquier miembro de la profesión legal ante los tribunales, para con sus representados y en las relaciones con sus compañeros debe ser sincera y honrada". La Comisión señala que, aunque la OAT no menciona este Canon en sus cargos, el mismo es aplicable al caso de autos.

Por último, el Canon 38 de Ética Profesional, 4 L.P.R.A. Ap. IXC. 38, dispone, en lo pertinente:

> El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. […]
>
> Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida privada como en el desempeño de su profesión, debe conducirse en forma digna y honorable.

Consiguientemente, un abogado que no se conduce digna y honorablemente viola el Canon 38 de Ética Profesional. In re Hernández Vázquez, 180 D.P.R. 527, 541 (2010); In re Roldán Figueroa, 106 D.P.R. 4, 12 (1977). Incluso, los abogados tienen la obligación de evitar la conducta impropia en su vida profesional y personal, tanto en la realidad como en la apariencia. In re Cotto Luna, 2013 T.S.P.R. 8, 187 D.P.R. ___ (2013); In re Peña, Santiago, 185 D.P.R. 764, 781 (2012). De lo contrario, podrían enfrentar la suspensión o desaforo del ejercicio de la profesión. In re Campoamor Redín, 150 D.P.R. 138, 153 (2000).

Habiendo expuesto las normas éticas que aplican al procedimiento disciplinario que nos ocupa, es meritorio pronunciarnos sobre la problemática de la violencia doméstica en nuestra sociedad. Como adelantamos, esta conducta está prohibida por la Ley Núm. 54, *supra*, la cual define la violencia doméstica como

un patrón de conducta constante de empleo de fuerza física o violencia psicológica, intimidación o persecución contra una persona por parte de su cónyuge, ex cónyuge, una persona con quien cohabita o haya cohabitado, con quien sostiene o haya sostenido una relación consensual o una persona con quien se haya procreado una hija o un hijo, para causarle daño físico a su persona, sus bienes o a la persona de otro o para causarle grave daño emocional. 8 L.P.R.A. sec. 602(p).

A su vez, define "violencia psicológica" como

un patrón de conducta constante ejercitada en deshonra, descrédito o menosprecio al valor personal, limitación irrazonable al acceso y manejo de los bienes comunes, chantaje, vigilancia constante, aislamiento, privación de acceso a alimentación o descanso adecuado, amenazas de privar de la custodia de los hijos o hijas, o destrucción de objetos apreciados por la persona, excepto aquellos que pertenecen privativamente al ofensor. 8 L.P.R.A. sec. 602(q).

La Ley Núm. 54, *supra*, reconoce que la violencia doméstica "es uno de los problemas más graves y complejos que confronta nuestra sociedad". Art. 1.2 de la Ley Núm. 54, 8 L.P.R.A. sec. 601. Véanse Pueblo v. Pérez Feliciano, 183 D.P.R. 1003, 1007 (2011); Pueblo v. Figueroa Santana, 154 D.P.R. 717, 723 (2001). Por ello, establece como política pública repudiarla enérgicamente "por ser contraria a los valores de paz, dignidad y respeto que este pueblo quiere mantener para los individuos, las familias y la comunidad en general". Íd. De hecho, el Art. 3.1 de la Ley Núm. 54, 8 L.P.R.A. sec. 631, tipifica esta conducta como delito grave de cuarto grado. Además, el Art. 3.2, 8 L.P.R.A. sec. 632, aumenta la pena de este delito a la correspondiente a delito grave de tercer grado "cuando se infiriere grave daño corporal a la persona" o "cuando se indujere, incitare u

obligare a la persona a drogarse con sustancias controladas", entre otras instancias.

Por nuestra parte, como integrantes de la Rama Judicial, estamos comprometidos a contribuir a erradicar de nuestra sociedad este grave problema. Dávila Nieves v. Meléndez Marín, *supra*. Como parte de este esfuerzo, la Rama Judicial adoptó el Manual de la OAT sobre la Intervención en Casos de Violencia Doméstica (2000) para establecer el protocolo de manejo en este tipo de casos. Además, la OAT publicó en 2010 el Manual del Estrado: Órdenes de Protección en Situaciones de Violencia Doméstica (Manual del Estrado) para proveer a los jueces y las juezas un instrumento de trabajo que les sirva para mejorar su desempeño en estos casos y "garantizar los derechos de las víctimas de violencia doméstica". Manual del Estrado: Órdenes de Protección en Situaciones de Violencia Doméstica (2010), pág. iv.

A esos efectos, el documento mencionado explica que la violencia doméstica es un patrón de conducta de poder y control. Manual del Estrado, pág. 89. El Domestic Abuse Intervention Project de Duluth, Minnesota, ilustra la dinámica de la violencia doméstica mediante una Rueda de Poder y Control compuesta por ocho ejes, a saber: 1) uso de privilegios masculinos, que incluye definir cuáles son los roles de género tradicionales de las mujeres y los hombres; 2) uso de abuso económico, como obligar a la víctima entregarle todos sus ingresos; 3) uso de los niños y las niñas de su pareja para ejercer control, como hacerla sentir

culpable por lo que estos hacen; 4) uso de amenazas y opresión, lo cual incluye amenazas de causarle daño o de abandonarla, obligarla a rehusarse a declarar en su contra y obligarla a cometer actos ilegales; 5) uso del menosprecio, la culpa y la negación; 6) uso de la intimidación, como provocar miedo rompiendo objetos; 7) uso del aislamiento, que incluye controlar a quién visita y con quién habla la víctima, limitar las salidas y participación en actividades fuera del hogar, así como recurrir a celos para justificar el aislamiento; y 8) uso de maltrato emocional, como desvalorizar a su pareja, hacerla sentir mal consigo misma, proferirle nombres soeces, humillarla y hacerla sentir culpable por la violencia que recibe. Íd., págs. 89-94.

La violencia doméstica suele presentarse de forma cíclica. Manual del Estrado, pág. 95. Según la investigadora Leonor Walker, el ciclo de maltrato tiene tres fases: fase de tensión, fase de explosión y fase de arrepentimiento y reconciliación. Íd., págs. 95-99. Con el tiempo, esta última fase desvanece y comienza un nuevo ciclo de violencia doméstica. Íd., pág. 98. Véase además, Á. Arechederra Ortiz *et al.*, Violencia Contra las Mujeres en la Pareja: Claves de Análisis y de Intervención, Madrid, R.B. Servicios Editoriales, S.L., 2010, págs. 27-18. En cada una de estas fases, la parte agresora muestra combinaciones de los comportamientos esbozados en la Rueda de Poder y Control. Manual del Estrado, pág. 99.

Por su parte, la víctima no suele identificar inmediatamente el patrón de maltrato, pues se confunde con los actos de arrepentimiento y promesas de cambio de la parte agresora. Manual del Estrado, pág. 89. Una vez lo reconoce, generalmente reacciona ocultando lo que ocurre y sintiendo vergüenza, impotencia o culpa. Íd. Véase además, Á. Arechederra Ortiz, *op. cit.*, págs. 33-34. Estos sentimientos son promovidos por la parte agresora, la cultura o por la esperanza de que su pareja cambie. Manual del Estrado, *supra*. El desprecio, desvalorización, denigración y burla que la violencia psicológica provoca sientan las bases para que las mujeres se sientan subordinadas y soporten luego ataques físicos y sexuales. D. Caratozzolo, La Pareja Violenta, del Amor y la Pasión, Argentina, Homo Sapiens Ediciones, 2003, pág. 16; R.M. Silva Bonilla y otras, Hay amores que matan: la violencia contra las mujeres en la vida conyugal, San Juan, Ed. Huracán, 1990, págs. 40-41. Véase además, Pueblo v. Ayala García, 186 D.P.R. 196 (2012). Las agresiones pueden tener consecuencias serias para la salud, como lesiones o daños físicos. Á. Arechederra Ortiz, *op. cit.*, págs. 30-31. Con frecuencia, la víctima sufre roturas timpánicas. Íd., pág. 31.

El Manual del Estrado continúa explicando a los jueces y las juezas que no existe un perfil determinado de las personas agresoras y de las víctimas de violencia doméstica. Manual del Estrado, págs. 99-100. Véase además, I. López Palau, Violencia contra la Mujer, San Juan, Editora

Centenario, S.A., 1999, pág. 84. En esencia, expone que "[l]a violencia doméstica ocurre porque es conducta aprendida, conducta que la persona agresora percibe es tolerada por su entorno social y decide utilizarla para ejercer poder y control sobre su pareja y así obtener lo que quiere". Manual del Estrado, pág. 100.

En vista de lo anterior, el documento mencionado sostiene que los jueces y las juezas pueden aportar con su conducta y determinaciones a detener el aprendizaje de la violencia y crear una sociedad que la condene en lugar de tolerarla y utilizarla como método de resolución de conflictos. Manual del Estrado, *supra*. Asimismo, el documento insta a nuestros magistrados y magistradas a no revictimizar a las víctimas de violencia doméstica cuestionándolas o culpándolas indirectamente de lo que les sucede. Íd., págs. 104-109. Véanse, además, N.S. Jacobson, J. Gottman, Hombres que Agreden a sus Mujeres: Cómo poner fin a las relaciones abusivas, Barcelona, Ediciones Paidós Ibérica, S.A., 2001, pág. 149; Manual de la OAT, *supra*, pág. 12. La persona agresora es la responsable de su comportamiento. V. Garrido, Amores que Matan, 3ª ed., Barcelona, Algar Editorial, 2001, pág. 162.

## III.

Es norma firmemente establecida que este Tribunal no alterará las determinaciones de hecho de la Comisión de Disciplina Judicial, en ausencia de parcialidad, prejuicio o error manifiesto. In re Claverol Siaca, 175 D.P.R. 177

(2009); In re Scherrer Caillet-Bois, 162 D.P.R. 842, 862 (2003). En el caso ante nos, la Comisión evaluó la prueba desfilada ante sí, adjudicó credibilidad y concluyó que todos los cargos imputados al Juez Santiago Concepción quedaron probados mediante prueba clara, robusta y convincente. Por ello, recomendó unánimemente la destitución del querellado de su cargo de juez y su desaforo del ejercicio de la abogacía.

Tras examinar detenidamente el Informe Final de la Comisión y la prueba que obra en el expediente, no encontramos justificación alguna para intervenir con las extensas y detalladas determinaciones de hecho realizadas por dicho foro. Coincidimos en que el querellado incurrió en la conducta imputada. Veamos.

Los cargos primero, segundo y cuarto imputan al querellado cometer actos de violencia física, psicológica y discrimen, públicos y privados, contra la licenciada BYDM. La Comisión hizo constar en su Informe Final que el testimonio de la licenciada BYDM le mereció entera credibilidad. Incluso, destacó que

> en este caso no está presente la intención de revancha de parte de la licenciada [BYDM] ni de otros testigos. […] La queja fue promovida, no por la licenciada [BYDM], sino por sus supervisores en SAL. Al margen de ello la propia [supervisora de la perjudicada] testificó que conoce al querellado desde el año 2009, que su relación con el querellado era bien cordial y su esposo […] preside la sala 406, justo al lado de la Sala 405 que el querellado presidió durante un periodo en Ponce. Además, se expresó de manera elocuente y muy favorable sobre la ejecutoria del querellado como Juez Superior. En cambio, era evidente que la licenciada [BYDM] compareció ante nos sin ánimos de rencilla, para cumplir con su deber de testificar luego de ser citada. Mientras hablaba

era palpable que aún sentía temor, se mostraba temblorosa, a veces llorosa. Demostró que, aparte de la cicatriz que observamos en su pómulo, aún conserva heridas psicológicas profundas producto de esta experiencia que permanecen a flor de piel. Muy distinto al lenguaje corporal que el querellado transmitió: rígido, artificial, controlador. Informe, págs. 38-39.

Además, sostuvo que lo declarado por la perjudicada fue reforzado por la prueba ofrecida por la OAT y el propio querellado. Asimismo, confirió entero crédito a las declaraciones de la supervisora de la licenciada BYDM y la Gerente de una tienda en Plaza las Américas. Por otra parte, la Comisión destacó que la postura de negación del querellado y la prueba que este presentó no le mereció ningún crédito, por estar repleta de contradicciones.

Para recapitular, mediante el testimonio de la licenciada BYDM, quedó probado que el Juez Santiago Concepción incurrió en un patrón de conducta constante de agresiones físicas, abuso psicológico e intimidación en su contra. En particular, ella detalló varias agresiones físicas graves que le propinó el Juez Santiago Concepción, provocándole heridas abiertas, inflamación y hematomas en el rostro; sangrado en el oído; hematomas en las extremidades; golpes en los costados; la ruptura de una costilla y dolor en un pie. Varias de estas lesiones requirieron asistencia médica y que se ausentara a su trabajo. Al respecto, la Comisión destacó que el Juez Santiago Concepción no actuó como un hombre prudente y razonable al no atender inmediatamente las necesidades médicas de la licenciada BYDM, que controló la versión que ella ofrecía a los doctores y que

nunca recurrió al mismo doctor ni hospital en más de una ocasión "para evitar señalamientos de sospecha de violencia doméstica y que se activara el protocolo de rigor". Informe, pág. 35. Ciertamente, lo anterior constituye violencia doméstica, según definida por la Ley Núm. 54, 8 L.P.R.A. sec. 602(p).

De igual forma, se demostró que el querellado deshonró y menospreció a su entonces esposa mediante insultos, humillaciones y epítetos soeces; limitó irrazonablemente su acceso y manejo de los bienes comunes al quitarle su sueldo mensualmente; la vigiló constantemente y le reclamó por sus tardanzas en llegar del trabajo; la aisló al prohibirle ver a su familia y almorzar con sus compañeros de trabajo; controló su alimentación y vestimenta; limitó su descanso y destruyó objetos pertenecientes a ella, incluso quemó su ropa. Ello configura la violencia psicológica estatuida en la Ley Núm. 54, 8 L.P.R.A. sec. 602(q).

Estas declaraciones fueron confirmadas por la supervisora de la licenciada BYDM, quien testificó sobre las marcas de los golpes que esta recibió, el cambio en su estado de ánimo y su apariencia física, así como sobre las mentiras del querellado para ocultar su conducta. Además, la Gerente de una tienda en Plaza las Américas testificó sobre la conducta agresiva y controladora del querellado, el carácter sumiso de la licenciada BYDM y las marcas que pudo observar en el cuerpo de esta dentro del probador. También quedó evidenciado con prueba documental y testimonial que un vecino

llamó anónimamente para denunciar un acto de violencia doméstica.

Así pues, el Juez Santiago Concepción incurrió en maltrato privado y público hacia su entonces esposa, lo cual incluyó usar su título de juez para intimidarla, y faltó a la sinceridad y honradez para con la supervisora de la licenciada BYDM al asegurarle que no sabía quién había agredido a su supervisada. Esta conducta refleja falta de temperamento judicial, prudencia, decoro, integridad y sensibilidad.

Por otra parte, el tercer cargo imputa al querellado el uso e incitación de uso de sustancias controladas. La Comisión encontró probado mediante prueba clara, robusta y convincente que, en efecto, el Juez Santiago Concepción poseyó y consumió cocaína y se jactó de llevar veinte años haciéndolo. Además, se evidenció que este incitó a la licenciada BYDM a hacer lo mismo y la obligó en varias ocasiones a acompañarlo a puntos de drogas para comprar cocaína. Siendo así, el Juez Santiago Concepción cometió la conducta imputada, la cual está prohibida por la Ley Núm. 4, *supra*, y podría constituir un agravante para el delito de violencia doméstica tipificado en la Ley Núm. 54, *supra*, de este ser procesado criminalmente por estos hechos.

Al resolver que el Juez Santiago Concepción incurrió en conducta constitutiva de violencia doméstica y uso de sustancias controladas, es forzoso concluir que violó los principios encarnados en los Cánones de Ética Judicial,

*supra*, y los Cánones de Ética Profesional, *supra*. Con su conducta, el querellado violó el Canon 1 de Ética Judicial, *supra*, al pretender estar por encima de la ley y no cumplir el llamado a respetarla y cumplirla, particularmente, al incurrir en conducta prohibida por la Ley Núm. 54, *supra*, y la Ley Núm. 4, *supra*.

También violó lo dispuesto por el Canon 4 del mismo código de conducta, *supra*, al ir en contra de la política pública del Gobierno y la Rama Judicial en contra de la violencia doméstica y el uso de sustancias controladas. Además, incumplió su obligación administrativa como juez de garantizar los derechos de las víctimas de violencia doméstica y convertirse en el agresor de una. De igual forma, el querellado violó el Canon 5 de Ética Judicial, *supra*, al discriminar contra la licenciada BYDM por razón de género, por razón de raza y color al llamarle "hija de negra" y por ideas religiosas al diferir de su interpretación de la Biblia y cuestionar su inteligencia.

Con su conducta, pública y privada, el querellado violó, además, el Canon 23 de Ética Judicial, *supra*, al no comportarse conforme lo exige su cargo y deshonrar la toga. De la misma forma, violó el Canon 38 de Ética Profesional, *supra*, al no exaltar el honor y dignidad de la profesión. Por tanto, todos los cargos presentados en contra del Juez Santiago Concepción quedaron probados mediante prueba clara, robusta y convincente.

Al nombrar un juez en nuestro ordenamiento jurídico, se deposita en él "la confianza de nuestro Pueblo con la esperanza de que la administración de la justicia se lleve a cabo por personas cuya conducta, en todos sus aspectos, sea intachable". In re Robles Sanabria, *supra*, pág. 511. Coincidimos con la Comisión en que "[e]s inconcebible que un juez que consume drogas y maltrata física y psicológicamente a su pareja, se dedique a juzgar y tomar decisiones en la vida de otros ciudadanos". Informe, pág. 40. Consiguientemente, ante la gravedad de la conducta cometida, la cual ciertamente va en contra de los principios de vida democrática y de respeto a la inviolable dignidad del ser humano que permean ambos códigos de conducta, nos vemos obligados a utilizar la única herramienta que tenemos a nuestra disposición en este tipo de caso: ejercer nuestra jurisdicción disciplinaria. Véase Art. V, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1.

IV.

Por todo lo anterior, decretamos la destitución inmediata de Reinaldo Santiago Concepción como Juez Superior del Tribunal General de Justicia de Puerto Rico y su desaforo del ejercicio de la profesión de la abogacía. Además, se refiere este asunto al Secretario de Justicia para la investigación y acción correspondiente.

Se dictará Sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Hon. Reinaldo Santiago Concepción          AD-2012-001

SENTENCIA

San Juan, Puerto Rico, a 22 de agosto de 2013.

Por los fundamentos expuestos en la Opinión *Per Curiam* que antecede, la cual se hace formar parte íntegra de la presente, decretamos la destitución inmediata de Reinaldo Santiago Concepción como Juez Superior del Tribunal General de Justicia de Puerto Rico y su desaforo del ejercicio de la profesión de la abogacía. Además, se refiere este asunto al Secretario de Justicia para la investigación y acción correspondiente.

Publíquese.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez no intervino.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo